# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 15, 2014 Session

## STATE OF TENNESSEE v. RICKEY BRADFORD

### Appeal from the Circuit Court for Lincoln County
### No. S1100043   Robert Crigler, Judge

### No. M2012-02616-CCA-R3-CD - Filed May 30, 2014

The Defendant, Rickey Bradford, was convicted by a Lincoln County Circuit Court jury of two counts of making a false report, Class C felonies, and extortion, a Class D felony. *See* T.C.A. §§ 39-16-502, 39-14-112 (2010). The trial court merged the false report convictions and sentenced the Defendant as a Range II, multiple offender to concurrent sentences of eight years for making a false report and five years for extortion. The court ordered that the effective eight-year sentence be served consecutively to any unexpired sentences. On appeal, the Defendant contends that (1) the trial court erred by admitting evidence regarding Navigator Telecommunications records, (2) the trial court erred by failing to instruct the jury on lost or destroyed evidence, (3) the trial court erred by admitting photographs taken from a lost or destroyed video recording, (4) the trial court erred by admitting bank records without requiring the State to comply with the Financial Records Privacy Act, (5) the trial court erred by permitting the State to impeach him with his previous conviction, and (6) that the cumulative effect of the trial court's errors requires a new trial. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Robert D. Massey, Pulaski, Tennessee, for the appellant, Rickey Bradford.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Robert J. Carter, District Attorney General; and Ann L. Filer, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case relates to a bomb threat at a Walmart store in Fayetteville, Tennessee. At the trial, Joe McGee testified that he worked as the night manager on November 22, 2010. The grocery-side entrance was the only door open after 10:00 p.m., and video recording devices were operational inside and outside the store. The store received a telephone call around 3:00 a.m., and Mr. McGee answered the phone. He said that a middle-aged, male caller said three bombs were inside the store and instructed him to put money in a bag, take it to the trees outside the store, and not to call the police. The caller said he was watching Mr. McGee and threatened to blow up the building if Mr. McGee did not comply. Mr. McGee did not believe the caller disguised his voice during the call.

After receiving the bomb threat, Mr. McGee dialed *57 to trace the caller, which was consistent with Walmart policy. All the employees and patrons were evacuated, and the police were called. Mr. McGee said several people were inside the store, including forty employees. The employees and patrons were evacuated to the area with the trees where the caller wanted the money placed. Mr. McGee did not place money at the trees. The police arrived shortly after the store was evacuated.

Mr. McGee testified that the bomb threat interrupted their stocking for the Thanksgiving holiday and disrupted his patrons' shopping. Mr. McGee, Jeff Porter, the store manager, and a few police officers entered the store to determine if anything was a threat. Although Mr. McGee was afraid to enter the store, he and Mr. Porter were in the best positions to know if something looked out of place. Mr. McGee feared for his safety and the safety of his employees and his patrons. He was concerned the injuries resulting from a bomb would be terrible. The caller did not identify a time frame in which he was required to deliver the money, but Mr. McGee understood he was to comply immediately.

Walmart Store Manager Jeff Porter testified that on November 22, 2010, he received a telephone call from Mr. McGee regarding a bomb threat. The police and fire department were at the scene when he arrived. He, Mr. McGee, several volunteers, and police officers entered the store to look for anything out of the ordinary. They did not find a bomb, the store did not explode, and the store reopened a couple of hours later.

Mr. Porter reviewed the store call log and testified that employee Rodney Medley called the employee automated system at 3:26 a.m., during which time the store was evacuated. He said the stocking of goods was affected because of the bomb threat. He said that around Thanksgiving, night-shift employees usually unpacked and stocked about 3500 to 4000 boxes of goods. He said sales were affected the next day because the building was not ready for business until 2:00 or 3:00 p.m.

Walmart Asset Protection Manager Matt Phelps testified that he managed all external and internal theft cases, safety-related issues, and inventory-related issues. He said the video recording system, which included exterior cameras in the parking lot, worked on November 22, 2010. The morning after the bomb threat, he and a detective reviewed the video recordings. He printed photographs of a man, who he said was suspicious based on the manner in which the man walked and the manner in which he entered and left the store. Based on his experience, he said that many times people entered the store and looked around as if they were "casing the place." He also printed photographs of the man's truck seen in the parking lot.

Mr. Phelps testified that the man came into the store twice on November 22, 2010. The first time, the man entered the grocery section, walked into apparel, looked around for a second, walked to the register with a couple of items, paid for the items, left the store, got into his blue truck, and left. A few minutes after the bomb threat was received, the man returned to the parking lot in the same truck. The man walked to the store "with a very determined purpose." As the man entered the store, Walmart employees told him to evacuate because a bomb threat was received. He provided the video recording and the photographs to law enforcement, which were received as exhibits. The State played portions of the recording to the jury showing the man's previously described movements.

Mr. Phelps was able to identify the man's purchase occurring at 2:47 a.m. in the store's electronic journal. The store record showed the man paid cash for two tobacco products and a drink. Mr. Phelps reviewed additional video recordings based on a tip he received and saw that two nights before the bomb threat at 1:50 a.m., a female from the same truck entered the store and made a purchase. He said the female left the store and got into the passenger side of the truck. The store's electronic journal showed the last four digits of the debit card number used in the transaction. He provided the information to a detective.

On cross-examination, Mr. Phelps testified that he learned of the bomb threat from Detective Eubanks when he arrived for work the next morning. He was provided a time frame in which the bomb threat was received and used that information to begin his investigation. He said he did not review the video recordings from November 20 before concluding that the truck was suspicious. The truck became suspicious to Mr. Phelps when it entered the parking lot twice. The tip he received about looking at video recordings from November 20 came from the detective showing third-shift employees a photograph of the man driving the truck. Mr. Phelps said the man appeared to be "twitching" when he paid for his items and talked to the cashier "a little more than normal for that time frame." Mr. Phelps agreed no one directed patrons not to enter the store after the bomb threat was received, although they were told to leave after entering.

Jared Parsons, Vice-President of Parsons Oil Company, testified that he supervised the company's convenience stores, including Arby's Shell Station near Walmart in Fayetteville. The store had surveillance cameras inside and outside on November 22, 2010. Officers contacted the store asking to review the video recordings from November 22. He learned someone used the pay phone to call Walmart when the convenience store was closed. He provided the police with a recording of the only person who used the pay phone at the specified time. He also printed photographs from the video recording, which included a photograph of the man driving a blue truck who used the telephone around 2:53 a.m. The man inside the truck was the same man who purchased two tobacco products and a drink at Walmart. Another photograph showed the truck leaving the convenience store at 3:01 a.m.

On cross-examination, Mr. Parsons testified that the video recordings were saved for five days and that on the sixth day, new recordings were taped over the old recordings. The company who owned the phone paid rent for the phone to be on Mr. Parsons's property, and he assumed the phone was operational.

Winter Walden-Schwartz testified that she was a customer service manager at the Walmart in Fayetteville and that she worked the night shift on November 22, 2010. She helped evacuate the customers and gathered them around the trees in the parking lot. On the night shift, most Walmart patrons were "regulars" who were leaving work from the local factories. She knew many of the regulars' faces. She spoke to a detective about her working the cash register when a particular patron checked out. A detective showed her a photograph of the suspicious man identified by Mr. Phelps, and she recognized him as a person she waited on before the bomb threat. The man told her he drove a truck from Florida, and he bought two tobacco products and a drink. She said the man wore a blue shirt and hat. She identified the receipt information from the man's purchase and her operator number. She previously waited on the man when he bought two identical tobacco products and wore the same clothes.

Michael McAllister testified that at the time of the offenses, he was general counsel and director of regulatory affairs for Navigator Telecommunications. Mr. McAllister identified November 22, 2010 call records regarding the pay phone at Arby's convenience store in Fayetteville. The records showed that at 2:59 a.m., a call was placed to the Fayetteville Walmart and that the call lasted one minute and fourteen and one-half seconds.

On cross-examination, Mr. McAllister testified that the document produced was a "call record," not a summary he compiled during his research, that each call produced a record, and that the record was used for billing purposes. The document was retrieved by Gary Pharis at Mr. McAllister's direction. Mr. Pharis obtained the call record and showed

the results to Mr. McAllister, who asked Mr. Pharis to obtain the information again while he watched Mr. Pharis retrieve the information.

Walmart market asset manager Glen Ford testified that his responsibilities included store safety and security. Mr. Ford had access to all data regarding debit and credit card purchases. He discussed the level of security involved to access a patron's full debit or credit card number and identified his printout from the system used to identify a particular transaction. He identified a November 20, 2010 purchase made at 1:50:58 a.m., which he said included the full debit card number used in the transaction.

Eddie Toombs, a regional security officer with Trustmark National Bank, testified that he received a subpoena to verify the validity of an account number. The data related to its account holders were maintained as part of the bank's regular business practices. The account number was identified as belonging to Lacey N. Spooner, who was issued a debit card for the account.

Fayetteville Police Officer Tony Metcalf testified that on November 22, 2010, Detective Eubanks showed him a photograph of a suspect the detective was attempting to identify. He told the detective the person in the photograph looked like the Defendant. He and the Defendant were distant relatives by marriage and had known each other since childhood. On cross-examination, he stated that he did not know at the time he viewed the photograph why the detective was looking for the Defendant.

Fayetteville Police Detective Adam Eubanks testified that he investigated the Walmart bomb threat. He learned the threat was received by a telephone call, obtained Walmart's telephone number, and sent inquiries to telephone service providers to determine the telephone number associated with the bomb threat. He learned from Navigator Telecommunications that a call was received by Walmart from a pay phone at Arby's Shell Station around 2:59 or 3:00 a.m. He contacted Mr. Phelps and asked him to review surveillance recordings at Walmart. Mr. Phelps provided a copy of the recording and printed still photographs from the recording of the man and the man's truck Mr. Phelps found suspicious. The man was later identified as the Defendant by Officer Metcalf.

Regarding the pay phone at Arby's Shell Station, Detective Eubanks reviewed the surveillance recording focusing on the pay phone and concluded that the truck in the recording was the same truck seen in the Walmart recording. The time stamp on the recording and still photographs was 3:01:01 a.m. Mr. Parsons provided a copy of the recording. After "quite a period of time" elapsed, the detective attempted to review the recording, but it was not on the flash drive. By the time the detective realized the recording

did not properly copy to his flash drive, the original recording at the convenience store had been overwritten.

Detective Eubanks learned from Ms. Walden-Schwartz that she was the cashier who helped the Defendant on November 22, 2010, and that she recalled the items purchased by the Defendant, the clothes he wore, and his purchasing items a couple of days previously. He reviewed with Mr. Phelps Walmart's security recordings from November 20, which showed the same truck. In the November 20 recording, a female got out of the passenger side of the truck, entered the store, and bought items with a debit card. The debit card information was later obtained by Walmart personnel, and the account holder information was later obtained from Trustmark National Bank. His investigation showed that the account holder, Ms. Spooner, was related to the Defendant and that the Defendant owned a truck matching the description of the truck seen in the video recordings at Walmart and at the convenience store.

Detective Eubanks located the Defendant at his mother's apartment on November 23, 2010. The detective noted that the Defendant wore clothes identical to those in the video recordings from November 22. The Defendant told the detective that he was at Walmart around 3:00 on the morning the bomb threat was made and that he went to Arby's Shell Station after leaving Walmart. The Defendant initially told the detective he went to the convenience store to purchase a lottery ticket but later said he wanted something to drink, although he purchased a drink at Walmart minutes earlier. When asked if the Defendant used the pay phone at the convenience store, he said that his cell phone service was not working and that he was going to use the pay phone to call his mother. The Defendant also admitted returning to Walmart after using the pay phone to purchase Campho Phenique. The detective did not observe a cold sore on the Defendant's mouth.

Detective Eubanks drove the distance between Walmart and Arby's Shell Station twice, which took one and one-half minutes and one minute and nine seconds respectively. On the second occasion, the traffic conditions were consistent with the time of the bomb threat, and he drove the speed limit and was not stopped by any traffic lights.

On cross-examination, Detective Eubanks testified that he did not give the prosecutor the flash drive in which the recording from Arby's Shell Station was supposed to be copied. He did not provide it to the prosecutor because the recording was not on the flash drive, although he denied attempting to load the flash drive onto equipment other than his computer. He attempted to recover fingerprints from the pay phone on November 22, but none were found, although he did not complete a respective report for his file.

Detective Eubanks learned the Defendant had Boost cell service but did not subpoena the records for his phone. He agreed the Defendant said that he "was at the phone to call his mother," not that he used the pay phone.

Fayetteville Police Officer Nathan Massey testified that he, Detective Eubanks, and Lieutenant Joel Massey, Officer Massey's father, went to the Defendant's mother's apartment to talk to the Defendant. He wore a video recording device on his shirt. The video recording was played for the jury. In the recording, the police officers knocked on the door and asked for the Defendant, the Defendant came to the door, Detective Eubanks read him his *Miranda* rights, and the Defendant said he understood his rights. The Defendant was asked to account for his whereabouts on Monday, November 22, 2010, at 2:50 a.m., and the Defendant said he was at Walmart. The Defendant said that after he left Walmart, he drove to a store to get something to drink. The detective said that the store was closed and that the Defendant was at the pay phone. The Defendant said he was attempting to get cell phone service to call his mother but denied calling her. The detective said that when the Defendant was sitting at the pay phone around 2:59 a.m., Walmart received a bomb threat from the pay phone at the convenience store. The Defendant admitted returning to Walmart for his cold sore medication. He said he went to the convenience store to purchase lottery tickets. He said he drank the soda he purchased at Walmart and needed another one. The Defendant was placed under arrest. The Defendant said he "never touched that phone."

Fayetteville Police Lieutenant Joel Massey testified that he assisted Detective Eubanks and Officer Massey in talking to the Defendant. He identified photographs he took of the Defendant's truck and said the Defendant was read his *Miranda* rights at the scene and at the police station.

Shelia Bradford, the Defendant's wife, testified for the defense that on November 20, 2010, she, the Defendant, their daughter, and their granddaughter traveled from Florida to Fayetteville for Thanksgiving. They stopped at Walmart when they arrived in the early morning hours to buy items for their daughter. They left Walmart and drove to the Defendant's mother's apartment. She said that the Defendant usually went to bed around 6:00 p.m. because of his construction job and that it was not unusual for him to go to Walmart in the early morning hours.

On cross-examination, Ms. Bradford testified that Ms. Spooner was the Defendant's and her daughter. She was unemployed from August 29, 2009 to March 9, 2010. She and the Defendant co-owned a truck matching the description of the truck in the recordings previously received as exhibits. She said that the Defendant was employed in November 2010, and that his mother was awake at 2:00 a.m. when they arrived at her apartment. They visited the Defendant's mother for about forty-five minutes to an hour, left, drove to her

father's house, and arrived there at 3:45 to 4:00 a.m. They slept for a while, woke, and visited the family. She said that the Defendant got up in the middle of the night on November 22, 2010, and left without her and that he was not with her from 2:30 to 3:00 a.m. She denied knowing about a $7000 civil judgment against the Defendant.

The Defendant testified that he worked in commercial building construction, that the duration of his employment depended on the work contracts, and that most of his work was on military bases in Florida. His work took him away from home multiple weeks a month, and his work hours during those times prevented a regular sleep pattern. He said he usually awoke around 1:00 or 2:00 a.m. He admitted to a previous battery conviction.

The Defendant had Boost cell service on November 22, 2010, and he changed providers because he did not have "service anywhere." He said that in Lincoln County, the service was poor because no cell towers were nearby. He denied entering Walmart on November 20 when he and his family arrived in Fayetteville. He gave similar testimony as Ms. Bradford regarding the family's movements after leaving Walmart on November 20.

The Defendant testified that on November 22, he woke up, went to town, and stopped at Walmart for tobacco and a drink. He left Walmart, drove to Arby's Shell Station for scratch-off lottery tickets, and realized the store was closed. He denied using the pay phone. He realized he did not purchase cold sore medication at Walmart and returned to purchase it. He denied calling in a bomb threat to Walmart.

The Defendant testified that Ms. Walden-Schwartz was the cashier when he checked out at Walmart on November 22, 2010, and recalled talking to her for a few minutes. He denied knowing about a $7000 judgment against him but said the issue was probably about property he and his former wife bought in Florida. He denied knowing he owed anyone money.

On cross-examination, the Defendant testified that he was employed last in 2010 and had just finished a construction job in November 2010. He stopped at Arby's Shell Station after leaving Walmart because the outside lights were on and because he thought the store was open. He attempted to retrieve his cell phone messages when he stopped in the Arby's parking lot. He thought he was there for about five minutes and denied seeing or intending to use a pay phone. He identified himself and his truck as depicted in photographs from Walmart and Arby's Shell Station.

Regarding his police interview, he agreed he told the police he was going to call his mother on the pay phone because he could not get service on his cell phone, although he stated at the trial that he did not park next to the pay phone to use it. He maintained he did

not intend to use the pay phone and said he sat inside his truck and attempted to get service on his cell phone. After the Defendant left Walmart when the employees told him the store was closed, the Defendant went to the Shelbyville Walmart. A receipt for lip balm was time stamped 5:17 a.m.

The Defendant was convicted of two counts of making a false report and extortion. The trial court merged the false report convictions and sentenced the Defendant as a Range II, multiple offender to concurrent sentences of eight years for making a false report and five years for extortion, for an effective eight-year sentence to be served in confinement. This appeal followed.

# I

The Defendant contends that the trial court erred by admitting as evidence the Navigator Telecommunications records and by permitting the State's witness to testify about the records. He argues that the document identifying the telephone number from which the bomb threat was made, the time of the call, and the number called was inadmissible hearsay and violated his confrontation rights because the information was researched and compiled by someone other than the State's testifying witness. The State responds that the court properly admitted the document pursuant to the business records exception to the rule against hearsay and that the testifying witness was a qualified, live witness to cross-examine. We conclude that the Defendant is not entitled to relief.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. One exception to the hearsay rule is records of regularly conducted activity. *Id.* at 803(6). Under this exception,

> [a] memorandum, report, record, or data compilation, in any form . . . made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the court of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness[.]

*Id*. The rule requires that the declarant have a business duty to record or transmit information and that without such duty, the business record lacks the trustworthiness for which the exception to the rule against hearsay is based. *Id*., Advisory Comm'n Cmts. "Whether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure

question of law," and the standard of review is de novo. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *Lilly v. Virginia*, 527 U.S. 116, 125 (1999)).

Before the trial, the State filed a motion seeking permission to present Mr. McAllister's affidavit and corresponding Navigator Telecommunication records regarding the details of the call made from the pay phone rather than to present Mr. McAllister, the records custodian, at the trial. The Defendant objected on the ground that he had the right to confront a live witness. In a written order, the trial court concluded that the Confrontation Clause prohibited the admission of the affidavit in lieu of a live witness.

At the trial, Mr. McAllister testified that the document produced was a "call record," not a summary he compiled during his research, that each call produced a record, and that the call record was used for billing purposes. He said the call record was retrieved by Gary Pharis at his direction. He said that Mr. Pharis obtained the call record and showed him the results and that he asked Mr. Pharis to duplicate the results of his investigation while Mr. Pharis retrieved the information in his presence.

The State attempted to present the affidavit created by Mr. McAllister. At a jury-out hearing, defense counsel objected to the admission of the affidavit related to the telephone records as hearsay. He argued the affidavit failed to meet the business records exception to the hearsay rule under Tennessee Rule of Evidence 803(6). Counsel argued that the affidavit was not produced in the ordinary course of regularly conducted business and was prepared for the purpose of litigation. Counsel noted that the affidavit referred to a printout of the call placed at the pay phone, which he argued was an inadmissible summary. Counsel, likewise, argued that the Confrontation Clause required the State to produce Mr. Pharis, who reviewed the company's records, investigated the pay phone at issue, and produced the printout of the telephone call.

Regarding the business records exception to the hearsay rule, the trial court stated that more than one records custodian could exist and that Mr. Pharis and Mr. McAllister were each custodians. The court found that Mr. Pharis created the document at Mr. McAllister's direction as a result of a subpoena and that Mr. McAllister verified the information contained in the document. The court found that Mr. McAllister had sufficient personal knowledge to authenticate the results of their investigation. The court, likewise, found that the telephone records were maintained by the company and that they were kept in the normal course of business. The court found that the printout regarding the relevant phone call identified the connection time as 2:59 a.m. on November 22, 2010, the pay phone's number, the number dialed, and the duration of the call. The court found that the printout was admissible evidence. The court found, though, that the affidavit was not a business record and was inadmissible hearsay.

The record shows that Michael McAllister was general counsel and director of regulatory affairs for Navigator Telecommunications at the time of the offenses. He testified that business records were maintained regarding the telephone calls made from their pay phones. The relevant document was a "call record," which was produced when a call was made from the pay phone and was used for billing purposes. Mr. McAllister directed Gary Pharis to retrieve the call record. Mr. Pharis obtained the call record and showed Mr. McAllister the results of his investigation, after which Mr. Pharis duplicated the results in Mr. McAllister's presence.

We conclude that the call record qualified as a business record exception to the hearsay rule. Navigator Telecommunication produced call records for each call placed by their pay phones, which included the incoming and outgoing telephone numbers, the date and time the call was made, and the duration of the call. The call record was created during the course of Navigator Telecommunications' regularly conducted business activity. We note the call records, like the one in the present case, were used for billing purposes, a business activity. The critical inquiry is whether the record itself was created in the regular course of business at or near the time of the recorded event. *State v. Baker*, 842 S.W.2d 261, 264 (Tenn. Crim. App. 1992) (stating that the record custodian "must be able to testify as to the identity of the record, the mode of preparation, and whether the record was made in the regular course of business at or near the time of the recorded event."). The call record was not created pursuant to a subpoena but was simply found and printed pursuant to a subpoena. The fact that the call record was researched and printed after it was recorded is of no consequence. We conclude that the trial court did not abuse its discretion.

Regarding the Defendant's claim that his confrontation rights were violated because the State should have presented Mr. Pharis, who located and printed the call record, instead of Mr. McAllister, we conclude that the Defendant's confrontation rights were not violated. The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Article I, section 9 of the Tennessee Constitution states, "That in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." This court "'has previously adopted the standards of the U.S. Supreme Court under the Sixth Amendment in determining'" whether a defendant's confrontation rights have been violated. *State v. Michael Presson*, No. W2012-00023-CCA-R3-CD, slip op. at 38 (Tenn. Crim. App. Apr. 24, 2014) (quoting *State v. Armes*, 607 S.W.2d 234, 237 (Tenn. 1980)); *see State v. Middlebrooks*, 840 S.W.2d 317, 332-33 (Tenn. 1992).

In *Crawford v. Washington*, 541 U.S. 36, 55 (2004), the Supreme Court concluded that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands . . . unavailability and a prior cross-examination." 541 U.S. at 68. When nontestimonial

-11-

evidence is at issue, the States have "flexibility in their development of hearsay law[.]" *Id*. Our supreme court has concluded that in Tennessee, "the admissibility of a nontestimonial hearsay statement is governed by the Tennessee Rules of Evidence." *State v. Franklin*, 308 S.W.3d 799, 810 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007)). Thus, nontestimonial statements are outside the scope of the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 821 (2006). The Supreme Court has concluded that business records do not contain testimonial hearsay. *See Crawford v. Washington*, 541 U.S. 36, 55 (2004); *see Crawford*, 541 U.S. at 76 (stating that if the Court were to conclude that business records were testimonial, it "would require numerous additional witnesses without any apparent gain in the truths-seeking process") (C.J. Rehnquist, concurring in judgment).

The trial court properly permitted Mr. McAllister to testify as the records custodian for Navigator Telecommunications. The call record was a business record and does not contain testimonial evidence. Mr. McAllister was general counsel for Navigator Telecommunications and knowledgeable about the record keeping process. Although he directed Mr. Pharis to research the relevant phone call and print the results, Mr. McAllister requested Mr. Pharis duplicate his results in Mr. McAllister's presence. Mr. McAllister was qualified as a custodian to testify about the call record in the present case. The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred by failing to include a jury instruction regarding lost or destroyed evidence. He argues that the lost recording from Arby's Shell Station warranted the instruction. The State responds that the trial court did not abuse its discretion by refusing to include the instruction. We agree that the Defendant is not entitled to relief.

In criminal cases, the trial court must give "a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction deprives the defendant of the constitutional right to a jury trial and is subject to a harmless error analysis. *See State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

The State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Our supreme court has said, "[T]he evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 915-16).

In *Ferguson*, our supreme court looked to *Arizona v. Youngblood*, 488 U.S. 51 (1988), as the "leading federal case regarding the loss or destruction of evidence." *Ferguson*, 2 S.W.3d at 915. Both *Ferguson* and *Youngblood* dealt with the loss or destruction of *potentially* exculpatory evidence. The Court in *Youngblood* concluded that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58. In *Ferguson*, our supreme court rejected the bad faith requirement in the *Youngblood* analysis because "proving bad faith on the part of the police would be, in the least, extremely difficult," and "the *Youngblood* analysis apparently permits no consideration of the materiality of the missing evidence or its effect on the defendant's case." *Ferguson*, 2 S.W.3d at 916. Instead, the court adopted a balancing approach and stated that the critical inquiry in determining the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory is whether "a trial, conducted without the destroyed evidence, would be fundamentally fair[.]" *Id.* at 914.

*Ferguson* imposed the duty on the State to preserve "potentially exculpatory evidence." Noting that the evidence in question "was probably of marginal exculpatory value," the court nevertheless said "it was at least 'material to the preparation of the defendant's defense' and might have led the jury to entertain a reasonable doubt about [the defendant's] guilt." *Id.* The court said that the State breached its duty to preserve the evidence and conducted the balancing analysis using the three factors we have noted below. *See id.* at 917.

In the present case, we begin with determining whether the State had a duty to preserve the evidence. *Merriman*, 410 S.W.3d at 785; *Ferguson*, 2 S.W.3d at 917. If the State had a duty to preserve the evidence and failed in that duty, the court should consider the following factors in determining the consequences of that error: (1) the degree of negligence involved, (2) the significance of the lost or destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at the trial to support the conviction. *Ferguson*, 2 S.W.3d at 917. If the trial court determines that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the

charges or craft such orders as may be appropriate, including a jury instruction, to protect the defendant's right to a fair trial. *Id.*; *Merriman*, 410 S.W.3d at 785-86. Review of a trial court's ruling on the fundamental fairness of a trial without the missing evidence is de novo. *Merriman*, 410 S.W.3d at 790. Review of the appropriateness of the remedy provided by the trial court is for abuse of discretion. *Id.*

The evidence shows that the police attempted but failed to copy the video recording from Arby's Shell Station to a flash drive. When the detective realized that the flash drive did not contain the recording, the original recording was no longer available for copying. The police were able to obtain still photographs showing the Defendant's truck at the pay phone outside the convenience store at the time Walmart received the bomb threat, which were presented at the trial. As a result of the lost recording from the convenience store, the Defendant requested an instruction on lost or destroyed evidence.

In a jury-out hearing, the Defendant made an offer of proof to show that the jury instruction was appropriate because the State violated its duty to preserve evidence. Detective Eubanks testified that he reviewed the video recording from Arby's Shell Station on the store's DVR. He said the DVR recordings remained stored for about six days and were then recorded over with new material. He said he reviewed the portion of the recording showing twenty minutes before and after 2:59 a.m., the time the bomb threat was received. He said that at 2:59 a.m., the Defendant's truck was parked in front of the pay phone. He said the only other vehicle in the recording during the time frame was an employee who did not park in front of the pay phone. He said no one got out of the truck to use the telephone.

On cross-examination, Detective Eubanks testified that he could not see anyone reach out the truck window to use the pay phone or see the occupant of the truck. He agreed the truck was parked between the telephone and the video camera.

The trial court stated that neither the State nor the defense asked the detective during his trial testimony about what he saw on the recording. The court found that the evidence was of marginal value and had no exculpatory value. The court found that the level of negligence in the destruction of the evidence was slight. The court noted the detective did not place the flash drive in the police file to prove at a later date that the recording was not on it. The court said, though, hindsight was always twenty-twenty. The court found that the detective testified during his trial testimony that once he realized the recording was not on the flash drive, it was too late to attempt to obtain another copy of it. The court found that the recording had minimal significance because the Defendant admitted being at the pay phone at the specified time. Regarding the sufficiency of the evidence, the court found that the state had presented a "good circumstantial case" and declined to provide a jury instruction regarding preservation of evidence.

We conclude that the State had a duty to preserve the video recording from the convenience store. Although the significance of the recording was diminished by the Defendant's admitting he was parked near the pay phone when Walmart received the bomb threat and by Detective Eubanks' testifying that the Defendant was not visible inside the truck, the evidence was potentially exculpatory in that the Defendant was not seen making a telephone call from the pay phone. The level of negligence, though, on the part of the State was slight because the detective believed a copy of the video recording was on the flash drive, although he failed to confirm the recording was copied before the time frame expired to obtain another copy. The Defendant denied using the pay phone. The truck's location prevented a showing whether the Defendant reached out the window to use the telephone, and the still photographs did not show whether the Defendant or someone else used the telephone. Regarding sufficiency of the other evidence, the Defendant admitted being at Walmart on the morning of the bomb threat and returning minutes after the threat was received to purchase cold sore medication, although no cold sore was visible hours after the bomb threat. He provided inconsistent statements to the police for his being at the convenience store. We conclude that the trial court did not abuse its discretion by failing to provide a jury instruction regarding lost or destroyed evidence. *See Merriman*, 410 S.W.3d at 790.

### III

The Defendant contends that the trial court erred by admitting into evidence still photographs taken from the lost recording at Arby's Shell Station. He argues that the admission of the photographs violated Tennessee Rules of Evidence 901(a) and 1002. He asserts that because the video recording was unavailable, the photographs taken from the recording were duplicates of the original and were inadmissible. The State responds that the trial court did not abuse its discretion. We agree with the State.

Tennessee Rule of Evidence 901(a) requires evidence to be authenticated or identified and provides, "The evidence of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Rule of Evidence 1002 states, "To prove the contents of a . . . photograph, the original . . . photograph is required, except as otherwise provided in these rules or by Act of Congress or the Tennessee Legislature." *Id*. at 1002.

However, "A duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." *Id*. at 1003. Likewise, "The original is not required, and other evidence of a . . . photograph is admissible if all originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith." *Id*. at 1001(4). "An

-15-

'original' of a photograph includes the negatives or any print. If data are stored in a computer or similar device, any printout or other output readable by sight and shown to reflect the data accurately is an 'original.'" *Id*. at 1001(3). "A 'duplicate' is a copy produced by the same impression as the original, or from the same matrix, or by means of photograph, . . . or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original[.]" *Id*. at 1001(4).

Although the Defendant claims the still photographs were inadmissible because the recording from which they came was unavailable, he does not dispute the accuracy of the depictions in the photographs. The photographs at issue were printed from the recording stored on a DVR at Arby's Shell Station, which was the original evidence. The accuracy and authenticity of the recording and photographs were not disputed. *See id*. at 1001(3). Likewise, the recording was not required and the photographs were admissible because the recording was lost but not in bad faith. *See id*. at 1001(4). Therefore, the still photographs were admissible under our rules of evidence. The Defendant is not entitled to relief on this basis.

## IV

The Defendant contends that the trial court erred by admitting bank records without requiring the State to comply with the Financial Records Privacy Act regarding the evidence related to Ms. Spooner's debit card that was used at Walmart two days before the bomb threat. He argues that Ms. Spooner was not given notice of the subpoena and was deprived of her right to attempt to quash the subpoena and that this violation of the Act made the evidence inadmissible. The State responds that the evidence was properly admitted because non-compliance with the Act does not require exclusion of the evidence. We agree with the State.

The Tennessee Financial Records Privacy Act states, in relevant part, that

[a] subpoena authorizing the production of financial records may be served upon a financial institution only if [a] copy of the subpoena has been served upon the customer, if the customer is available for service, in the manner provided by law for the service of subpoena, or, in any judicial proceedings in which the customer is a named party, a copy of the subpoena has been served on the customer in the manner provided for the service of pleadings subsequent to the original complaint by the Tennessee Rules of Civil Procedure[.]

-16-

T.C.A. § 45-10-106(1) (2012). Further, the Act provides that "[a] financial institution shall not be required to produce financial records in response to a subpoena unless [t]he subpoena indicates that the requirements of § 45-10-106 have been met[.]" *Id*. at § 45-10-107(a)(1). The statute provides,

> The customer, in the case of a judicial subpoena issued in a proceeding in which the customer is not a party, has not moved to quash the subpoena within ten (10) days after service of a copy of the subpoena on the customer; or in the case of a nonjudicial subpoena, the customer has not notified the issuer, within ten (10) days after service of a copy of the subpoena, in which case the issuer must petition an appropriate court and obtain approval of the court before issuing the subpoena.

*Id*. at § 45-10-106(2).

Defense counsel objected to Mr. Toombs's identifying the account holder for the debit card on the ground that the State failed to comply with the provision of the Financial Records Privacy Act requiring service of a copy of the subpoena on the person whose financial information was sought, which provided the account holder the opportunity to file within fifteen days a motion to quash the subpoena. Counsel stated that the subpoena did not show Ms. Spooner was provided a copy of the subpoena and that Ms. Spooner told counsel she did not receive a copy. Counsel argued that as a result, the evidence related to the account was inadmissible.

The trial court noted that section 45-10-107 provided that a financial institution shall not be required to produce financial records in response to a subpoena. The court found that although the bank was not required to produce records related to the account, a bank representative was present at the trial nonetheless. The court found that the statute did not preclude admission of his testimony.

Although the Defendant contends that noncompliance with the statute made the banking records inadmissible against him at his trial, he cites no authority for his position that he has standing to object to the admission of the banking records. In any event, this court has concluded that "the Act is directed to financial institutions," and "contains no penalty for its violation and certainly does not prohibit the introduction of evidence obtained without compliance with the Act[.]" *State v. M. Dale Lowe*, No. 89-92-III, slip op. at 19 (Tenn. Crim. App. 1990), *perm. app. denied* (Tenn. Feb. 11, 1991). We conclude that noncompliance with the Act did not render Ms. Spooner's financial records inadmissible at the Defendant's trial. The Defendant is not entitled to relief on this basis.

# V

The Defendant contends that the trial court erred by permitting the State to impeach him with his previous battery conviction. He argues that the court failed to determine the conviction was relevant to his credibility pursuant to Tennessee Rule of Evidence 609. The State concedes that the trial court failed to analyze the relevance of the battery conviction to the Defendant's credibility but argues that any error by the trial court was harmless. We conclude that the Defendant is not entitled to relief.

Pursuant to Tennessee Rule of Evidence 609, the credibility of the accused may be attacked by presenting evidence of prior convictions. The prior conviction must be for a felony offense or for a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Less than ten years must have elapsed between the date the accused was released from confinement and the commencement of the prosecution. *Id*. at 609(b). Also, the State must give reasonable written notice of the impeaching conviction before trial, and the trial court must find that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. *Id*. at 609(a)(3); *see State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999); *State v. Farmer*, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). This requires the court to analyze the impeaching conviction's relevance to credibility and to determine the similarity between the current offense and the offense underlying the impeaching conviction. *State v. Thompson*, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000); *see Mixon*, 982 S.W.2d at 674. The previous felony conviction "need not involve dishonesty." *Thompson*, 26 S.W.3d at 109. The trial court's decision to allow a prior conviction under Rule 609 will not be reversed on appeal unless the trial court abused its discretion. *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Before the trial, the Defendant sought to exclude his previous convictions pursuant to Rule 609. In a written order, the trial court took the Defendant's motion under advisement and reserved ruling until the trial. We note the transcript from this hearing is not included in the appellate record.

In a jury-out hearing at the trial, the trial court found that the Defendant had previous felony convictions for theft, arson, attempt to commit a felony, and battery, for which he received respective two, four, one, and two-year sentences. The court found that the State could impeach the Defendant if he chose to testify with his 2001 felony battery conviction. The court found that the probative value of the conviction outweighed its prejudicial effect and that it was a dissimilar crime than the current offenses. The court precluded the State from using the other convictions for impeachment purposes because they were committed in 1982 and 1991 but permitted their use if the defense opened the door.

The State concedes that the trial court failed to analyze the conviction's relevance to the Defendant's credibility.  Pursuant to Florida law, felony battery is defined as "actually or intentionally touch[ing] or strik[ing] another person against the will of the other . . . and [c]aus[ing] great bodily harm, permanent disability, or permanent disfigurement." Fla. Stat. § 784.041.  Regarding the similarity of the offenses, the purpose contemplated by the Rule is to prevent the danger that a jury will improperly consider a similar previous conviction as "evidence of the propensity of the defendant to commit the [charged] crime." *State v. Waller*, 118 S.W.3d 368, 373 (Tenn. 2003). Because the Defendant's previous battery conviction and the current offenses are dissimilar, the unfair prejudicial effect of the battery conviction was minimal.

Although Rule 609 suggests that the commission of any felony is "generally probative" of a defendant's credibility, our supreme court has rejected a per se rule that permits impeachment by any felony conviction. *Mixon*, 983 S.W.2d at 674; *Waller* 118 S.W.3d at 371.  We note that although the Defendant asserts that his battery conviction was inadmissible because it did not involve dishonesty, Rule 609 requires a previous felony conviction or a previous conviction for an offense involving dishonesty or a false statement. Previous felony convictions "need not involve dishonesty." *Thompson*, 26 S.W.3d at 109.

This court has upheld the admission of unlawful weapon possession and drug-related convictions under Rule 609, in part, because the defendant's credibility was the "paramount factual issue in the case." *State v. Timothy Aaron Baxter*, No. W2012-02555-CCA-R3, slip op. 11 (Tenn. Crim. App. Jan. 3, 2014).  This court concluded that the convictions were probative of the defendant's credibility, which became an issue when he denied standing at the podium while the trial court instructed him about when to return to court. *Id*. (citing *State v. Jeffery Yates*, No. W2003-02422-CCA-R3-CD, slip op. at 14-15 (Tenn. Crim. App. July 21, 2009) (concluding that "the [d]efendant put his credibility . . . at issue because he took the witness stand and denied that he had been with Michael Kay" when the offense occurred and that "the probative value of past actions of poor moral character became particularly important"); *see State v. Michael Brady*, No. M1999-02253-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App. Jan. 12, 2001) (concluding that the defendant "made his credibility an important issue by denying any wrongdoing and asserting legitimate conduct").

In the present case, the Defendant admitted being at Walmart before and after the bomb threat was received.  He admitted being at Arby's convenience store when the bomb threat was made but denied placing the telephone call from the pay phone.  Rather, he asserted he was engaging in legitimate conduct, although the store was not open for him to purchase lottery tickets or a second drink. We note that although the State presented a strong circumstantial case that the Defendant made a bomb threat by using the pay phone outside the convenience store, no direct evidence showed the Defendant using the pay phone at the

relevant time. The Defendant made his credibility a critical issue by denying any wrongdoing, which the jury had to assess, and the battery conviction was probative of his credibility. *See State v. Bruce Marvin Vann*, No. W2002-00161-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. Mar. 31, 2003) (concluding that the trial court did not abuse its discretion by admitting felony evading arrest and reckless endangerment convictions pursuant to 609 when the Defendant's credibility was a critical issue for the jury to determine); *see also See Jeffery Yates*, slip op. at 14-15; *Timothy Aaron Baxter*, slip op. at 10. Thus, although the trial court failed to engage in a full analysis pursuant to Rule 609, we conclude that the trial court did not abuse its discretion by permitting the State to impeach the Defendant with his previous felony battery conviction. We conclude that the probative value of the evidence on the Defendant's credibility substantially outweighed any prejudicial effect. The Defendant is not entitled to relief on this basis.

**VI**

The Defendant contends that the cumulative effect of the trial court's errors entitles him to a new trial. The State responds that the Defendant has not established that he is entitled to a new trial on the basis of cumulative error. We agree with the State.

The cumulative error doctrine stands for the proposition that "multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). Our supreme court has stated that "'the combination of multiple errors may necessitate the reversal . . . even if individual errors do not require relief.'" *State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

We have concluded that the trial court did not abuse its discretion in the evidentiary issues raised by the Defendant. As a result, cumulative error does not exist. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE

-20-